Morning, Your Honors. I'm Ralph Ellenwood from the CJA panel in Tucson representing Jeffrey Vigil. Vigil, okay. Yeah. Every time we're in court, it depends whether somebody's pronouncing it Hispanic or otherwise. But he uses Vigil. Okay. What we have here in this case is a field officer not asking a few questions. That's really what this boils down to. He gets what I call a negotiating tip, what if I told you, and then later that vehicle may or might contain marijuana. He never asks, well, how do you know that? What kind of a vehicle would it be? What color would it be? Who's driving the vehicle? Male, female, geared, old, young? He never asks any of those questions. And then he follows the vehicle clearly with the intent to stop it. And during that pursuit, he discovers it hasn't crossed at a port of entry. And the significance of that, as I put in my brief, I think is essentially nothing. And the magistrate judge didn't think it had any value either. The second thing he discovers is that the truck is registered to a woman in Tucson, the nearest large city. Again, the magistrate judge didn't think that was of any great significance either. And according to Officer Irby, he stops the vehicle based on the truck being registered in Tucson, didn't cross through a port of entry. He believes, although there's no articulable facts to support it, that it had evaded the Border Patrol checkpoint on Interstate 19 and on the tip from Mr. Hickey. Let me just ask, how would you distinguish this case from the United States v. Arvizu, if I'm pronouncing it correctly? Where the Supreme Court's held that the agents did have reasonable suspicion of criminal activity based on the totality of the circumstances. The district judge seemed to think totality was here. How would you distinguish this case from Arvizu? Well, I don't think that you have the specific articulable facts that you had in Arvizu. For instance, just as an example, the officer said, well, this is an area notorious for drug smuggling, which, of course, all of Arizona is. It's right along the Mexican border. But in his testimony at the motion hearing, when asked specifically about that, he says, well, I've been working down there six years. I've made about 20 stops for drug smuggling. Well, that's a little over three a year. That's hardly a large number. Judge Burry, the district judge, put a lot of weight on, well, Agent Irby had the opportunity to look at his facial expressions and sense his tone of voice and all this, although there's nothing in the record anywhere that he, in fact, did any of those things. What Agent Irby testified to was that he believed him, Hickey, because he didn't want to go to prison. And yet all of us who work in the criminal justice courts know that the least reliable informant is the one that's trying to get a benefit. And this guy clearly was negotiating for a benefit. He didn't bite, but they didn't ask the right questions. I'm quite sympathetic to what you say about jailhouse niches. I mean, they are, as a group, rather unreliable. This is a special circumstance, though, because the officer is going to be in a position to figure out pretty fast whether he's telling the truth, as distinct from a jailhouse niche who sort of supports the prosecutor's story and the prosecutor's quite happy to use it and so on. So I'm not sure that your generalization from people who want to stay out of prison or get out of prison are unreliable to the fact that this case carries much weight. Well, Your Honor, if some questions had been asked, first of all, Agent Irby has never had contact with Hickey before, doesn't know him from Adam. Right. He's had a few moments there by the side of the road, but he never asked any of the questions that might tend to establish the reliability of his information. I went through them just a few minutes ago, obvious questions. The prosecutor, in arguing at the motion hearing, said to the magistrate judge, he should have asked some more questions. He didn't do it, but that's what we're stuck with here. Sure. So adding to the list of factors that might have influenced the officer to think that he had reasonable suspicion would be, apparently this road is known for drug smuggling. That is to say, if you're going to try to get something north, you're going to do it on this road. Second, that drug smuggling vehicles often travel in tandem. And third, and I'm just kind of working off of what Judge Brewery said, possible, even likely, that they're coming from a place where the drugs would have been offloaded and then they're just sort of loading up and going north. Those factors go beyond the factors that you mentioned as giving grounds for reasonable suspicion. Are those illegitimate factors? Are there reasons that I shouldn't attach much weight to them? Help me out with those factors. Judge Fletcher, I don't think you ought to attach any weight to them. And the reason is because it essentially applies to every single vehicle traveling on this road going north. I mean, we all know the drugs are brought across the Mexican border to the south of here. Every single vehicle traveling north then, I suppose, is a suspicious vehicle. This road, and there's a map that the government added to the excerpts of record that was used at both the motions hearing and the trial, which shows clearly this road, which goes from Sassody, you can hook in coming from Maravaca, going north up to three points where it connects with another road. It's the only paved road in the area. And it's an example, too, of why there weren't really any exigent circumstances here in terms of Irby asking a few more questions. There's no place to go. The road goes north, it goes south. He was going north. There's no place to get off. There's no place to go. And so there was plenty of time to ask a few questions. But to answer your questions, everything would then be stoppable because it applies to every single vehicle. Well, I wouldn't say that. I mean, if the only thing is you have a vehicle going north on that road, that's clearly not enough. I'm asking whether that factor, in addition to the things that he already knew, that is to say this tip and so on, would be enough. Obviously your answer is no, but I'm trying to figure out on what basis I should attach little or no weight. It seems to me that there's at least some weight that can be attached to that. Well, I don't see how you can attach weight to something that applies to everybody. For instance, you say they often travel in tandem. Unfortunately for the government, there's no evidence here that was known to Agent Irby at the time that he made the stop that anybody was traveling in tandem with Hickey. And the general proposition, well, they do this in tandem, doesn't really differentiate anything from anything else. Okay. I would like to reserve just a few minutes for rebuttal if I may. Okay. Sure. Thank you. May it please the Court. I'm Elizabeth Strange from the U.S. Attorney's Office in Tucson, and I represent the United States in this case. What the defendant is doing on appeal is repeating the mistake that the magistrate made. Defendant is taking the tip, isolating it, considering it, and then taking each of the other factors, ignoring the totality of the circumstances, and taking each of the other factors separately and saying, Well, that's consistent with innocent activity. That's consistent with inactivity. That's not what the Supreme Court has said. Well, let me just ask, because I have trouble with that. We don't want to sweep everybody in the United States, anyone who drives that road, without more. And here was somebody that the police officer had never seen before. He had no basis, although he spoke to him face to face. There were many other factors in Arvizu that we don't have here. The ability to see the car itself, that the passengers weren't looking at the police officer. They were covering up something here. We had none of that here. Would you concede the police officer should have asked more questions? What color is the car? What kind of car is coming? Et cetera. There really wasn't a lot here. No. I would not concede that. And also, I think there are many factors that support this, similar to Arvizu. The in-person tip in this case, he had already given up his anonymity. He had given his parole card. So that's one indicia of reliability. He could be held accountable if he gave bad information. The agent determined he was credible because he was motivated to give good information. But he didn't say, I know the car is coming. And suppose they stopped the car and didn't find drugs. He wouldn't have been harmed very much. He did not say he didn't ñ he wasn't particular about the car, when it was coming, what color it was, the kind of car. He didn't stand to lose a great deal if they picked up a car and said, well, that's not the car I meant. Because he hadn't really honed in on what the car was. I disagree, Your Honor. There had not been any other cars on that road, 286, that day that the agent had seen. He had been on duty for at least an hour. He had been at the stop for about 20 minutes. And the informant, Hickey, said, what about if I tell you the next car is going to contain or may contain marijuana. And then five minutes later, the car came. That struck the agent as significant based on his experience of what ñ of that road and his experience that morning. He relied on the fact that here was a guy who just got busted with a loan of marijuana, so he assumed that there was some basis of knowledge. Reasonably, there would be a basis of knowledge. Then when the car passed, it slowed down. The defendant slowed down. It's a 55-mile-an-hour zone, slowed down to 25 miles per hour, even though they were way off the road. Looked at Hickey, the guy just busted, and looked at the agent, and then continued on his way. And at that point ñ Can I ask you something? How far away was the stopped vehicle from the road when he slows down and then looks at each of them separately? I don't know, Your Honor. The testimony had been from the agent was that they were completely pulled off the road. So there was no reason ñ there was nothing barring just driving by. How far off the road, I don't think there's anything in the record. And you say he looked at each one of them separately. Do you know how close together or how far apart they were? My understanding from the record was Hickey was sitting in the back of a Border Patrol car. It might have been a ñ I don't recall the type of the car. It might have been a truck. With the door open and the agent was standing next to ñ on the other side of the door. Well, the reason I ask that question, unless the passing vehicle with Mr. Vigil in it is really close, it's going to be hard for the officer to see he looked at one and then the other, if they're standing right next to each other. This was an issue that the magistrate asked about at the evidentiary hearing. And the agent's response was, I saw the driver. I saw him look to the side of me. The only person he would have been looking at would have been Hickey. And then he looked at me. So that's the testimony. Okay. That's the only evidence in the record. Okay. And to get back, as this car ñ as a defendant's passing, at that point, Hickey says, what about if I tell you that car may contain marijuana? So it was a contemporaneous tip, which this Court has acknowledged it makes it more reliable. And at that point, based on other factors, not simply this in-person tip, but this road is known for ñ notorious for smuggling. It was headed north, which would be the direction that smugglers would be going. What about opposing counsel's argument that it's the only road, everyone knows that it's the way to Mexico and that drugs are transported along these roads? I mean, if that is the reason, then every car would be subject to stop. Well, no. This is not the only road. The more ñ if you were coming from Arivaca, the more direct route would be to go over to I-19. This road is known because it's the way to go to circumvent the checkpoint that's near I-19. Then wouldn't that subject every car on that road to a stop? No. Not ñ no, it would not. And that's ignoring the other factors that went into play, looking at the totality of circumstances here that the agent ñ But they're driving by, there are not many cars, and they look over to a car on the side of the road. I mean, if I'm driving along a road and I see someone stop, wouldn't most people look over and wonder what it's about? But, Your Honor, you can't just look at each factor individually and say, well, this particular factor ñ I understand. You're arguing totality of circumstances. So you have the road and you have them looking at the car on the side of the road. What else do you have? Well, you have the informant, whom they had never known or never met before, and they said, oh, he said, what if I told you this? He didn't say, that's the car or that's the person or whatever. What else is there? Well, Your Honor, I do think that the court has to give due deference to inferences that the agent has made based on his experience and specialized training in this area, and he's the one who had the conversation. As the district court said, you know, on the record, this, you know, there sound like questions. Well, what about if I told you, you know, the next car contained marijuana? You know, on the cold record, that doesn't sound like a tip. But as the district court credited, he had the ability to judge his demeanor, judge his So I think that that should not be so dismissed. After the agent decided to follow the truck, he called and found that the registration was not to the driver, someone living, a woman living in Tucson. He found out that the truck had not come through a port of entry, which he found significant because he said there's no legitimate commerce down there, and if you're normally, if you were coming from Mexico, you would have legally, you would have come through one of the port of entries down there. He found that also significant. The other thing was the behavior of the driver. After the Border Patrol agent pulled out behind him, and he's in a marked vehicle, the driver, instead of looking straight ahead and driving, he was checking his mirrors, looking behind him, going beneath the speed limit. Yeah, I think I'm going to get picked up then. When the cops are behind me, I keep looking at them, and I don't speed. Well, I think that's a good practice, Your Honor, but I think that what's important is, again, you can't, you have to look at the cumulative factors in this case. In the Supreme Court, in Arvizu, and as this Court has applied it in its own cases, you look at all the factors, the cumulative information. You have to give deference to what the agent, what he drew from that, what conclusions and inferences he drew from that. And that's simply just one factor. But, you know, taking the totality of the circumstances, he had reasonable suspicion. Every car on that road. This doesn't mean you're going to win or lose, but I have to say I've heard so many of these cases over the years. It was suspicious because he never looked at me. It was suspicious because he kept looking at me. It was suspicious because he never changed his speed. It was suspicious because he slowed down a little bit. Everything's suspicious. I mean, their behavior keeps changing, and every time he looked at me, oh, that's a problem. He didn't look at me, that's a problem. You've seen these cases, too. Yes, and I understand your point completely, which is, I think, why it's been instructed you need to look at totality of the entire circumstances. This case is very similar to Palos Marquez, which this Court decided the only – in terms of looking at the tip in addition to the totality of the circumstances, and that's the UPS driver. Now, he didn't have any history with the UPS driver who gave the tip, but it was a – you know, it was given at the same time. It was – I see that my time is up. But I urge the Court to follow Arvizu and its – and the case in Palos Marquez. Okay. Thank you. Thank you. You've saved some time. Thank you. I'd like to – I think counsel's a little confused about the alleged tips and the order of them. The first statement was, what if I told you that the next vehicle – and then the next tip was the next car may or might contain. So, of course, there's no accountability, as the Court made a reference to here. If it had turned out they stopped somebody that didn't have any marijuana, all he had to say is, well, I told you it may or might. That's not a commitment. That's not even a tip. It's just a suggestion. That's a ticket to jail. That's a ticket to jail. Well, he was going to jail anyway, I can assure Your Honor. One way or the other, that was going to happen. The other thing is, with regard to exactly what – why Hickey believed him, which belays found is found at volume two, page 184 of the excerpts of the record. And he states very clearly, I believed him because he did not want to go to prison. And that's all there was. And that got expanded into an analysis of facial features and tone of voice that just simply isn't in the record anywhere at all. The bottom line is that in this country, we're allowed to drive around on the highways for commerce, for pleasure, or for any other reason whatsoever without ever having to explain why we're there or that we have a purpose to do so. This road wasn't put in by the State of Arizona to provide an avenue for drug dealers. It was to build a highway for the use by the general public. It goes through Buenos Aires Wildlife Preserve. It's near the famous Baboquivari Peak. There are many, many reasons why people might be on that road that are perfectly legitimate and have no basis in crime. Thank you. Okay. Thank both sides for your argument. The case of the United States v. Beale now is submitted for decision. And that completes our argument for this morning. We will be back tomorrow, although I suspect you will not be. All right. Time to go home.
judges: Duffy, Nelson D. W., Fletcher W.